56

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KELLY SERVICES, INC.,

        Plaintiff,

v.

CYNTHIA EIDNES,

        Defendant.

Case: 2:07-cv-14989
Judge: Feikens, John
Referral MJ: Majzoub, Mona K
Filed: 11-21-2007 At 02:34 PM
CMP KELLY SERVICES V CYNTHIA EIDENS (SS)

BUTZEL LONG
By: James J. Giszczak (P46917)
     Katherine D. Goudie (P62806)
150 West Jefferson, Suite 100
Detroit, MI 48226
(313) 225-7000
Attorneys for Plaintiff

## PLAINTIFF KELLY SERVICES, INC.'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Pursuant to Fed. R. Civ. P. 65, Plaintiff Kelly Services, Inc. ("Kelly") moves this Court for a Temporary Restraining Order and a Preliminary Injunction. Defendant Cynthia Eidnes ("Eidnes") has accepted employment with a direct competitor, Beacon Hill Staffing Group ("Beacon Hill"), in direct violation of her non-competition, non-solicitation, and non-disclosure agreement with Kelly. While employed with Kelly, Eidnes served as Kelly's Placement Director for Kelly Legal Registry and worked with Kelly's most confidential information, trade secrets.

Eidnes' employment with Beacon Hill has, or inevitably will, result in the misappropriation and misuse of Kelly's confidential and proprietary business information.

Indeed, Eidnes has already solicited Kelly's customers, including one of Kelly's top five accounts in Eidnes' market area, on behalf of Beacon Hill.

The wrongful acts of Eidnes have been calculated and designed to undercut and irreparably harm Kelly's competitive position and customer goodwill.    Accordingly, Kelly has no option but to seek injunctive relief from this Court in an effort to protect its contractual interests, its confidential and proprietary business information, and trade secrets, as well as its customer relationships and goodwill.   Because Kelly has no adequate remedy at law for its injuries, which will continue and be aggravated in the future unless Eidnes is restrained, Kelly is entitled to a temporary restraining order and preliminary injunction to prevent further harm.

Respectfully submitted,

BUTZEL LONG

James J. Giszczak (P46917)
Katherine D. Goudie (P62806)
150 West Jefferson, Suite 100
Detroit, MI 48226
313/983-7475
giszczak@butzel.com
goudie@butzel.com
Attorneys for Plaintiff

Dated: November 21, 2007
969462

2

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KELLY SERVICES, INC.,

      Plaintiff,

                                                  Case No. 07-_____ _____

v.

                                                  Hon. _____ _____ ___

CYNTHIA EIDNES,

      Defendant.

---

BUTZEL LONG
By:  James J. Giszczak (P46917)
      Katherine D. Goudie (P62806)
150 West Jefferson, Suite 100
Detroit, MI 48226
(313) 225-7000
Attorneys for Plaintiff

---

**PLAINTIFF KELLY SERVICES, INC.'S BRIEF IN SUPPORT OF MOTION FOR
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

**Page**

CONTROLLING OR MOST APPROPRIATE AUTHORITY .................................................iii

QUESTION PRESENTED.......................................................................................... v

I.    INTRODUCTION ........................................................................................... 1

II.   STATEMENT OF FACTS ............................................................................... 1

      A.   Eidnes' Employment with Kelly...................................................... 1

           1.   Eidnes' Position as Placement Director for KLR ...................... 1

           2.   Eidnes' Execution of Her Agreement With Kelly ..................... 2

           3.   Eidnes' Access to Kelly's Confidential Information
                and Trade Secrets....................................................................... 3

      B.   Eidnes' Resignation from Kelly and Employment with Beacon Hill.................... 4

      C.   The Irreparable Harm Suffered by Kelly .......................................... 5

III.  ARGUMENT:  THIS COURT SHOULD GRANT A PRELIMINARY INJUNCTION
      RESTRAINING AND ENJOINING EIDNES' UNLAWFUL CONDUCT.................... 5

      A.   Kelly Will Prevail on the Merits..................................................... 7

           1.   Eidnes Has Breached her Enforceable Agreement with Kelly ................. 7

                a.   The Agreement Protects Kelly's Legitimate
                     Business Interests........................................................... 8

                b.   The Restrictions in the Agreement are Reasonably
                     Tailored to Protect Kelly................................................. 8

                c.   Eidnes has Blatantly Violated her Reasonable Agreement......... 10

           2.   Eidnes has Violated the Michigan Uniform Trade Secrets Act.............. 11

           3.   Eidness is Tortiously Interfering with Kelly's Contractual
                and Business Relations and Expectancies..................................... 14

i

B.    If Preliminary Injunctive Relief is not Granted, Kelly will Suffer Irreparable Injury .................................................................................... 15

C.    The Harm to Kelly if a Preliminary Injunction is Denied Outweighs the Harm to Eidnes if it is Granted ...................................................................................... 17

D.    The Public Interest Supports the Issuance of a Preliminary Injunction.............. 17

CONCLUSION ................................................................................................................. 18

# CONTROLLING OR MOST APPROPRIATE AUTHORITY

**Cases**                                                                      **Page**

*Ainsworth v. Hunting & Fishing Club*
153 Mich. 185; 116 N.W. 99 (1908) ................................................................. 15

*Bristol Window & Door, Inc. v. Hoogenstyn*
250 Mich. App. 478; 650 N.W.2d 670 (2002) .................................................... 9

*Chem-Trend v. McCarthy*
780 F. Supp. 463 (E.D. Mich. 1991) ................................................................. 16

*DeLorean Motors Co.*
755 F.2d 1223, 1229 (6th Cir. 1985) .................................................................. 6

*Detroit v. Salaried Phys, UAW*
165 Mich. App. 142, 151; 418 N.W.2d 679 (1987) .......................................... 18

*Frisch's Restaurants, Inc. v. Shoney's, Inc.*
759 F.2d 1261, 1270 (6th Cir. 1985) .................................................................. 6

*Frontier Corp v. Telco Comm. Group., Inc.*
965 F. Supp. 1200 (S.D. Ind. 1997) ................................................................... 9

*Kelly Services, Inc. v. Noretto*
495 F. Supp. 2d 645 (2007) ...................................................... 7, 10, 13, 15, 17

*La Calhene, Inc v. Spolyar*
938 F. Supp. 523 (W.D. Wis. 1996) ................................................................. 12

*Liberty Heating & Cooling, Inc. v. Builders Square, Inc.*
788 F. Supp. 1438, 1447 (E.D. Mich. 1992) .................................................... 15

*Little Caesar Enterprises v. R-J-L Foods*
796 F. Supp. 1026, 1030 (E.D. Mich. 1992) ...................................................... 6

*Lowry Computer Products, Inc. v. Head*
984 F. Supp. 1111, 1113 (E.D. Mich. 1997) ........................................ 6, 7, 8, 9, 16

*Merrill Lynch, Inc v. Gall*
836 F. Supp. 428, 433-34 (W.D. Mich. 1993) .................................................... 8

*Merrill Lynch, Inc. v. Ran*
67 F. Supp. 2d 764, 775 (E.D. Mich. 1999) ............................................ 8, 11, 12

*Morlife v. Perry*
56 Cal. App. 4th 1514, 1521; 66 Cal. Rptr. 2d 731 (1997) ......................................................... 11

*Pepsico, Inc. v. Redmond*
54 F.3d 1262 (7th Cir. 1995) ............................................................................................... 12, 13

*Rehmann, Robson & Co v. McMahan*
187 Mich. App. 36, 46; 466 N.W.2d 325 (1991)....................................................................... 7, 10

*Superior Consultant Co., Inc. v. Walling*
851 F. Supp. 839, 847-48 (E.D. Mich. 1994) ..................................................................... 8, 10, 15

*Trepel v. Pontiac Osteopathic Hosp.,*
135 Mich. App. 361, 374; 354 N.W.2d 341 (1984)(citations omitted) ...................................... 14

*Uncle B's Bakery, Inc. v. O'Rourke*
920 F. Supp. 1405 (N.D. Iowa 1996) ....................................................................................... 12

*University of Texas v. Camenisch*
451 U.S. 390 (1981)................................................................................................................. 5

*Winiemko v. Valenti,*
203 Mich. App. 411, 417; 513 N.W.2d 181, 184 (1994)............................................................. 14

## **Statutes** **Page**

M.C.L. § 445.774a ....................................................................................................................... 7
M.C.L. § 445.774a(1) ................................................................................................................. 10
M.C.L. § 445.1901 (MUTSA) ........................................................................................... 11, 12, 14
M.C.L. § 445.1903(1) ................................................................................................................. 11

## QUESTION PRESENTED

Should this Court temporarily and preliminarily enjoin Defendant Cynthia Eidnes from competing with Plaintiff Kelly Services and from soliciting Kelly's customers when Eidnes' employment with Kelly's direct competitor, Beacon Hill, and her solicitation of Kelly's customers result in Eidnes' breach of her non-competition, non-solicitation, and non-disclosure agreement, her breach of fiduciary obligations, and the misappropriation and misuse of Kelly Services' confidential information and trade secrets?

Plaintiff Kelly Services answers:     Yes

# I.  INTRODUCTION

Plaintiff Kelly Services, Inc. ("Kelly") is a staffing services company that specializes in providing a wide range of employment staffing and consulting services, including, but not limited to, outsourcing, recruitment, recruitment process outsourcing, temporary staffing services, vendor on-site and full-time placement, and consulting services.  Kelly employed Defendant Cynthia Eidnes ("Eidnes") as a Placement Director for the State of Minnesota, and the majority of her work and customer contact was in Hennepin, Ramsey, Dakota, Anoka, Scott, Carver, Washington, Stearns, and Blue Earth Counties, Minnesota.  Because of her access to Kelly's confidential information, trade secrets, and customers, Eidnes executed an employment agreement, which prohibited her, for a period of one year after leaving Kelly's employment, from a number of activities related to Kelly's employees and customers and work with a competitor.

Kelly has recently discovered that since Eidnes' departure from Kelly, she is working for a direct competitor, Beacon Hill Staffing Group ("Beacon Hill"), in the same market area that she worked in for Kelly; and on behalf of Beacon Hill, Eidnes is soliciting customers with which she worked while employed with Kelly – all in direct violation of her agreement.  During Eidnes' employment with Beacon Hill, she has, and will inevitably continue to, misappropriate and misuse Kelly's confidential information and trade secrets. Therefore, Kelly requests that this Court enter a temporary restraining order and preliminary injunction against Eidnes to prohibit her unlawful conduct and to protect Kelly from suffering further irreparable harm.

# II.  STATEMENT OF FACTS

## A.  Eidnes' Employment with Kelly

### 1.  Eidnes' Position as Placement Director for KLR

1

Kelly is a staffing services company that specializes in providing a wide range of employment staffing and consulting services, including, but not limited to outsourcing, recruitment, recruitment process outsourcing, temporary staffing services, vendor on-site and full-time placement, and consulting services. (Verified Complaint ("Compl."), ¶ 6.)

Eidnes was employed with Kelly from January 1, 1999 through November 1, 2007. (Compl., ¶ 7.) Eidnes worked as Kelly's Placement Director for one of its divisions, Kelly Legal Registry ("KLR"). Although Eidnes was responsible for all of Minnesota, the majority of her work and customer contact was in Hennepin, Ramsey, Dakota, Anoka, Scott, Carver, Washington, Stearns, and Blue Earth Counties, Minnesota. (Compl., ¶ 8.)

Throughout her employment with Kelly, Eidnes reported to and regularly communicated via e-mail and the telephone with employees at Kelly's headquarters in Troy, Michigan such as the Vice President of KLR. (Compl., ¶ 9.)

### 2.    Eidnes' Execution of Her Agreement with Kelly

On May 1, 2000, Eidnes executed an Agreement with Full Time Employees of Kelly Corporations ("Agreement") with Kelly. (**Exhibit A.**)  Pursuant to the Agreement, Eidnes agreed as follows:

(1)    ...I will never disclose, use, copy, or retain any confidential business information or trade secrets belonging to Kelly, Kelly's customers, or Kelly's suppliers. This includes customer and employee lists; sales, service, recruiting and training techniques and manuals; sales and marketing strategies; computer programs; financial data and other similar information.

(2)    While I am working for Kelly, I will not solicit any of Kelly's customers or employees for a competing business, and I will not compete against Kelly or associate myself with any Kelly competitor as an employee, owner, partner, stockholder, investor, agent, or consultant. These same limitations apply for one year after I leave Kelly in any market area in which I worked or had responsibility during the past five years of my employment with Kelly. [Exhibit A, ¶¶ 1, 2.]

The Agreement also provides that Eidnes ". . . will pay Kelly's reasonable attorney's fees and costs involved in enforcing this Agreement." (*Id.* at ¶ 6.) Additionally, the Agreement has a Michigan choice of law provision. (*Id.* at ¶ 7.)

### 3.    Eidnes' Access to Kelly's Confidential Information and Trade Secrets

During the course of her employment with Kelly and her extensive interaction with and responsibilities over Kelly's most critical accounts, Eidnes had access to and utilized on a regular basis Kelly's confidential and proprietary information, including information concerning Kelly's business affairs; customer lists and leads; operational procedures and strategic planning; employee information; marketing and sales strategies and practices; customer pricing, contractual details for customers, customer profits, customer needs, training methods and needs; recruiting and resourcing details and information; and the weaknesses and strengths of KLR's services.  (Compl., ¶ 14.)  The customer information, such as contracts, relationship details, pricing, business development efforts, leads, and resourcing and recruiting methods, is housed on Kelly's computer servers, which are located at Kelly's headquarters in Troy, Michigan. (Compl., ¶ 15.)  A sample of the trade secrets that Eidnes utilized and has knowledge of are attached as **Exhibit B.**[1]

Kelly provided Eidnes with extensive training and knowledge of Kelly's business processes, strategic planning as to the corporate, divisional, and regional business plans, marketing strategies, and recruiting strategies.  For instance, Eidnes attended a meeting in Troy, Michigan for the KLR managing directors and sales force. (Compl., ¶ 16.)

---

[1] **Exhibit B** contains a <u>redacted</u> sample of Kelly's trade secrets to protect this information's confidentiality.  An unredacted sample will be made available for the Court to conduct an *in camera* review upon request.

The information to which Eidnes was exposed is of great value not only to Kelly, but also to its competitors who do not possess, or have access to, this information. For this reason, Kelly takes reasonable steps to ensure that its information stays confidential. Such measures include the use of non-compete, non-solicit, and confidentiality agreements, password protection, and access to information on a need-to-know basis. (Comp., ¶ 17.)

**B.    Eidnes' Resignation from Kelly and Employment with Beacon Hill**

Eidnes voluntarily resigned her employment at Kelly effective November 1, 2007. (Comp.., ¶ 18.) On October 31, 2007, Eidnes came into work and informed her supervisor, Michael Stacy that it was her last day with Kelly. When Mr. Stacy questioned Eidnes about her future plans, Eidnes refused to disclose the identity of her new employer. (Compl., ¶ 19.)

Recently, Kelly discovered that Eidnes took a position, and is working, for Beacon Hill, a direct competitor of Kelly. (Compl., ¶ 20.) Kelly recently confirmed Eidnes' new employment through Beacon Hill's website, which lists Eidnes as Beacon Hills' Legal Division Director and states that Beacon Hill established its Minneapolis office in 2007. (**Exhibit C**, Beacon Hill Website.) The website further provides a description of Eidnes' role:

> Cindy Eidnes, JD, *Division Director*
> Ms. Eidnes is responsible for directing Beacon Hill Legal in Minneapolis. She has been a major force in the Twin Cities legal staffing market since 1993, providing temporary attorneys to both firms and corporations covering large scale document reviews to high level attorney requirements within various areas of substantive legal expertise. She also specializes in the direct placement of attorneys and has staffed paralegals on both a direct and temporary basis. Prior to joining Beacon Hill, Ms. Eidnes became known as a top provider of contract and temporary attorneys, opening and managing the first legal staffing company in the Twin Cities to provide document review project work and high level temporary placements. . . . [**Exhibit C**.]

4

Kelly also recently discovered that Eidnes is soliciting Kelly customers on behalf of Beacon Hill and has targeted one of Kelly's top five accounts in Eidnes' market area. (Compl., ¶ 22.)

## C.   The Irreparable Harm Suffered by Kelly

The confidential information and trade secrets to which Eidnes had access will directly aid her employment with a direct competitor, including Beacon Hill. (Compl., ¶ 23.) As a direct consequence of Eidnes' actions, Kelly stands to lose its clients and customers, confidential, proprietary and trade secret information, the goodwill and referral business of its clients and customers, and revenues in an amount that cannot be readily ascertained. (Compl., ¶ 24.) Kelly is also faced with the substantial risk that Eidnes will unlawfully use Kelly's client and customer information and trade secrets to Kelly's competitive disadvantage. As a result of Eidnes' actions, Kelly has suffered and will continue to suffer irreparable harm. (Compl., ¶ 25.)

If Eidnes is not immediately barred from violating her Agreement and from using Kelly's confidential and proprietary information to solicit customers of Kelly and from otherwise participating in activities that violate the non-competition and non-solicitation provisions of the Agreement, Kelly will continue to suffer irreparable harm. (Compl., ¶ 26.) Kelly lacks an adequate remedy at law to address the substantial and irreparable harm it is suffering as the result of Eidnes' actions. (Compl., ¶ 27.)

### III.   ARGUMENT:
### THIS COURT SHOULD GRANT A PRELIMINARY INJUNCTION
### RESTRAINING AND ENJOINING EIDNES' UNLAWFUL CONDUCT

The purpose of a preliminary injunction is to protect the status quo pending final determination of the lawsuit. *University of Texas v. Camenisch*, 451 U.S. 390 (1981). A plaintiff may obtain a preliminary injunction by demonstrating to the court that the defendant is

acting in a manner that will irreparably injure plaintiff or that will render a final judgment on the merits ineffectual. *In re DeLorean Motors Co.,* 755 F.2d 1223, 1229 (6th Cir. 1985). In granting a preliminary injunction a court will determine:

1. whether the plaintiff has shown a likelihood of success on the merits;

2. whether irreparable harm could result to plaintiff if the preliminary injunction is not issued;

3. whether the threatened harm to the plaintiff outweighs the threatened harm the injunction may inflict on the defendant; and

4. whether the granting of the preliminary injunction will serve the public interest.

*Lowry Computer Products, Inc. v. Head,* 984 F. Supp. 1111, 1113 (E.D. Mich. 1997). The four considerations are factors to be balanced; they are not prerequisites that must be met. *DeLorean,* 755 F.2d at 1229. A preliminary injunction should issue if the moving party "at least shows serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to defendant if an injunction is issued." *Little Caesar Enterprises v. R-J-L Foods,* 796 F. Supp. 1026, 1030 (E.D. Mich. 1992) (citing *Frisch's Restaurants, Inc. v. Shoney's, Inc.,* 759 F.2d 1261, 1270 (6th Cir. 1985).)

As discussed below, even if Eidnes had a change of heart and intended to move forward with the utmost good faith, Eidnes cannot prevent, absent appropriate injunctive relief, her knowledge of Kelly's confidential information from showing up in her work. *Lowry,* 984 F. Supp. at 1116 (If defendant "is working for a direct competitor in a similar area, their knowledge is bound to have a significant impact on Lowry's business.") Once this information has been divulged, it cannot be retrieved. This is particularly true here because Eidnes was entrusted with Kelly's most sensitive information. Because Kelly can successfully satisfy these four factors,

this Court should grant Kelly's Motion for Temporary Restraining Order and Preliminary Injunction.

## A.    Kelly Will Prevail on the Merits.

### 1.    Eidnes Has Breached Her Enforceable Agreement with Kelly.

Kelly is likely to succeed on the merits of its action against Eidnes for breach of the Agreement because: (1) Eidnes is currently employed by Beacon Hill, a direct competitor of Kelly, in the same market area; (2) Eidnes is soliciting and working with customers with which she had significant contact while employed at Kelly; and (3) consequently, Eidnes has misappropriated and is misusing Kelly's trade secrets.

Michigan law provides that "reasonable" covenants not to compete against employees should be enforced. *Rehmann, Robson & Co v. McMahan*, 187 Mich. App. 36, 46; 466 N.W.2d 325 (1991). M.C.L. § 445.774a provides:

> Sec. 4a. (1) An employer may obtain from an employee an agreement or covenant which protects an employer's reasonable competitive business interests and expressly prohibits an employee from engaging in employment or a line of business after termination of employment if the agreement or covenant is reasonable as to its duration, geographical area, and the type of employment or line of business. To the extent any such agreement or covenant is found to be unreasonable in any respect, a court may limit the agreement to render it reasonable in light of the circumstances in which it was made and specifically enforce the agreement as limited.

*Id.* (emphasis added). A non-compete agreement is, thus, enforceable as long as: (1) it is reasonably drawn as to its duration, geographical scope, and line of business; and (2) it protects the legitimate business interests of the party seeking its enforcement. *Lowry*, 984 F. Supp. at 1116.

Indeed, this Court has already concluded that Kelly's Agreement is reasonable and enforceable. In *Kelly Services, Inc. v. Noretto*, 495 F. Supp. 2d 645 (2007), a copy of which is attached as **Exhibit D**, Judge Gadola analyzed Kelly's Agreement with Noretto, which contained

7

terms that are identical to Eidnes' Agreement, and found that the duration, geographic restriction, and the scope of activity were all reasonably tailored to protect Kelly's legitimate business interests. *Id.* at 657.

### a.   The Agreement Protects Kelly's Legitimate Business Interests.

The fact that Eidnes' Agreement protects Kelly's legitimate business interests cannot be disputed.   Employers have legitimate business interests, for example, in restricting former employees from soliciting its customers, *Merrill Lynch, Inc v. Gall*, 836 F. Supp. 428, 433-34 (W.D. Mich. 1993) (applying Michigan law); and in protecting confidential and proprietary information, such as customer lists, profit margins, corporate strategies, and pricing schemes. *Lowry*, 984 F. Supp. at 1116; *Superior Consultant Co., Inc. v. Walling*, 851 F. Supp. 839, 847-48 (E.D. Mich. 1994); *Merrill Lynch, Inc. v. Ran*, 67 F. Supp. 2d 764, 775 (E.D. Mich. 1999). Because Eidnes had access to and utilized on a regular basis Kelly's most confidential information and was granted extensive customer contact, there is no dispute that Kelly has the requisite protectable interests.

### b.   The Restrictions in the Agreement are Reasonably Tailored to Protect Kelly.

As for reasonableness, in this case, the non-competition obligations could not be narrower. Eidnes is restricted from competing with Kelly, and from soliciting Kelly's customers and employees, for a period of one year from the termination of her employment, in the market area in which she worked or had responsibility during the past five years of her employment with Kelly. It prohibits Eidnes only from competing with Kelly in the business of staffing services, including outsourcing, recruitment, recruitment process outsourcing, temporary staffing services, vendor on-site and full-time placement, and consulting services. This prohibition is restricted to a narrow and focused industry.   The prohibition is further limited by the market area of

8

Hennepin, Ramsey, Dakota, Anoka, Scott, Carver, Washington, Stearns, and Blue Earth Counties, Minnesota. Eidnes therefore has many opportunities to work for other companies in areas outside the restricted market area and with different customers or in a plethora of other industries. She is therefore not unduly restricted from gaining a livelihood by this Agreement.

With respect to time limitation, one year is also reasonable. Michigan courts have consistently held that covenants with one-year durations are reasonable and enforceable. Indeed, far longer periods of time have been upheld. *See, e.g., Lowry,* 984 F. Supp. at 1116 (finding one year reasonable and emphasizing that "as to duration, courts have upheld time periods of six months to *three years."); Bristol Window & Door, Inc. v. Hoogenstyn,* 250 Mich. App. 478; 650 N.W.2d 670 (2002) (enforcing a three-year, statewide non-competition agreement executed by an independent sales representative). Therefore, the duration of one year in Eidnes' Agreement is more than reasonable and necessary to protect Kelly's customer goodwill, competitive edge, and confidential and trade secret information.

The geographic limitation in Eidnes' Agreement – "any market area in which I worked or had responsibility" – is sufficiently and reasonably tailored to protect Kelly. Relative to geographic limitations, it has been specifically held that reasonable geographic limitations may be unlimited and as broad as the entire continental United States if the plaintiff's business is sufficiently national and international in scope. *Walling,* 851 F. Supp. at 847 (emphasizing that Superior "does business in forty-three states"). Michigan courts also do not require specific language in the non-compete agreement as to the geographic scope. For instance, courts will allow a reasonable customer restriction to substitute for a geographic restriction. *See, e.g., Frontier Corp v. Telco Comm. Group., Inc.,* 965 F. Supp. 1200 (S.D. Ind. 1997) (applying

Michigan law and holding that the non-compete covenant, which contained no geographic term, was enforceable as to customers that the defendant successfully solicited.)

In this case, although Kelly's business is national and international in scope, the prohibition is limited only to the market area where Eidnes worked or had responsibility – Hennepin, Ramsey, Dakota, Anoka, Scott, Carver, Washington, Stearns, and Blue Earth Counties, Minnesota. The non-competition clause does not have to expressly list these counties; it is sufficient that the clause prohibits Eidnes from working in any market area where she worked or had responsibilities. Thus, the language of the non-competition agreement and the resulting prohibition is reasonable and enforceable.[2]

In view of the above stated case law and this Court's decision in *Noretto*, it is clear that the non-compete and non-solicit obligations in the Agreement between Eidnes and Kelly are legally enforceable under Michigan law.

### c.    Eidnes Has Blatantly Violated Her Reasonable Agreement.

There is no dispute that Eidnes violated her Agreement with Kelly. Eidnes agreed that for one year after leaving Kelly's employment, she would not to compete against Kelly or associate herself with any Kelly competitor, in any market area in which she worked or had responsibility during the last five years of her employment with Kelly. Kelly has recently discovered that Eidnes is working for Beacon Hill, in the same market area that she was responsible for as a Kelly employee, and Eidnes, on behalf of Beacon Hill, is soliciting customers with which she worked while employed by Kelly. Her new employment and solicitation of Kelly's customers is a clear breach of her Agreement with Kelly.

---

[2] The Court may enforce the agreement to the extent the contract is unreasonable by substituting reasonable terms for those omitted or found to be unreasonable. Under Michigan law, courts are permitted to modify overbroad covenants to the extent needed to protect the employer's legitimate interests. M.C.L. § 445.774a(1); *Rehman,* 187 Mich. App. at 46.

Furthermore, Eidnes agreed that she would never use or disclose any confidential business information or trade secrets belonging to Kelly or Kelly's customers. Despite these contractual obligations, Eidnes is using Kelly's confidential information and trade secrets to compete, solicit key customers of Kelly, and undermine Kelly's customer goodwill and competitive edge. As a result of her actions, Eidnes has breached, and is continuing to breach, her Agreement with Kelly.

### 2.    Eidnes Has Violated the Michigan Uniform Trade Secret Act.

Eidnes' use and disclosure of Kelly's confidential information is also enjoinable under the Michigan Uniform Trade Secrets Act (MUTSA), M.C.L. § 445.1901, et seq. M.C.L. § 445.1903(1) provides:

> Actual or threatened misappropriation may be enjoined. Upon application to the court of competent jurisdiction, an injunction shall be terminated when the trade secret has ceased to exist, but the injunction may be continued for an additional reasonable period of time in order to eliminate commercial advantage that otherwise would be derived from the misappropriation.

Under MUTSA, a two prong analysis is employed to determine whether information constitutes a protectable trade secret:

1.   Does the information derive independent economic value from not being generally known to others; and

2.   Did the employer take reasonable steps to protect the confidentiality of the information. [M.C.L. § 445.1901; *Ran,* 67 F. Supp. 2d at 775.]

Any argument by Eidnes that the information that was misappropriated is public knowledge is simply incorrect. Information concerning Kelly's pricing, services, and customers constitutes intimate knowledge, attainable only because of Eidnes' employment with Kelly. *See Morlife v. Perry,* 56 Cal. App. 4th 1514, 1521; 66 Cal. Rptr. 2d 731 (1997) ("[W]here the employer has expended time and effort identifying customers with particular needs or

characteristics, courts will prohibit former employees from using this information to capture a share of the market.").

Courts will order injunctive relief even when no actual misappropriation has occurred, but misappropriation is threatened. This general rule is consistent with numerous decisions from other courts enjoining threatened disclosure pursuant to the Uniform Trade Secrets Act. *See, e.g., Pepsico, Inc. v. Redmond,* 54 F.3d 1262 (7th Cir. 1995) (applying Illinois law); *La Calhene, Inc v. Spolyar,* 938 F. Supp. 523 (W.D. Wis. 1996) (applying Wisconsin law and enjoining defendant from using plaintiff's confidential information, such as strategic and marketing plans and technical specifications); *Uncle B's Bakery, Inc. v. O'Rourke,* 920 F. Supp. 1405 (N.D. Iowa 1996) (applying Iowa law and finding irreparable harm in light of the economic value derived from plaintiff's confidential information and defendant's employment with a competitor).

In *PepsiCo, Inc. v. Redmond,* the Court was faced with a similar factual scenario and applied Illinois' version of the MUTSA. Redmond worked for PepsiCo as a general manager, which gave him access to inside information and trade secrets, such as strategic plans, marketing, distribution information, marketing plans, growth expectations, operational changes, and financial goals. As part of his employment, Redmond signed a confidentiality agreement with PepsiCo.     Redmond subsequently resigned his employment with PepsiCo and accepted employment with Gatorade. At the outset, the Seventh Circuit pointed out that the Illinois Trade Secret Act provided that a court may enjoin the "actual or threatened misappropriation" of a trade secret. The Court further stated that "PepsiCo finds itself in the position of a coach, one of whose players have left, playbook in hand, to join the opposing team before the big game." *Id.* at 1270. Thus, when the Court of Appeals coupled the demonstrated inevitability that Redmond would rely on PepsiCo's trade secrets, with the district court's reluctance to believe that

Redmond would refrain from disclosing these secrets in his new position, the Court of Appeals concluded that the district court correctly decided that PepsiCo demonstrated a likelihood of success in its statutory claim of trade secret misappropriation. *Id.* at 1271.

Furthermore, in *Noretto*, this Court found that the information to which a Kelly manager is exposed constitutes trade secrets. 495 F. Supp. 2d at 658-59. Based on the defendant's knowledge of these trade secrets, his employment with a competitor, and his solicitation of Kelly's customer, this Court further held that Kelly had a substantial likelihood of success on the merits of its trade secret claim.

Similar to the fact pattern in *Noretto*, there already is evidence of Eidnes' actual misappropriation of Kelly's trade secrets through her solicitation of Kelly's customers. Eidnes was among a select few placed in a position of trust and confidence with regard to Kelly's confidential business information and key customers. During her employment, Eidnes worked with the most proprietary, sensitive and confidential business information of Kelly including, but not limited to, confidential compensation methods, customer needs, customer account information, prospective customer information, strategic plans, and marketing strategies. Kelly's confidential and proprietary information and documents have been established at considerable time and expense to Kelly and are not generally known. Kelly's proprietary and confidential information and trade secrets are of immense value to anyone operating in a similar business as Kelly, such as Beacon Hill. Kelly created the information and property that Eidnes has in her possession over many years and at a great cost. In fact, Eidnes has the ability to use Kelly's trade secrets and Kelly's customer contacts, underbid Kelly, and take its business – this misappropriation is already begun.

Eidnes' continued use and disclosure of Kelly's proprietary and confidential information for Beacon Hill's advantage is inevitable. Eidnes has fiduciary obligations not to disclose this information and not to wrongfully use this information for her own competitive advantage. Eidnes' possession and inevitable use of Kelly's trade secrets has allowed Eidnes and Beacon Hill to step into the shoes of Kelly, without having to spend money and do the work performed by Kelly to develop the information and property. Accordingly, Eidnes' use of Kelly's confidential information is also enjoinable under MUTSA, and all claims contained in the Verified Complaint will result in success on the merits.

### 3. Eidnes Is Tortiously Interfering with Kelly's Contractual and Business Relations and Expectancies.

Kelly will also suffer irreparable harm from Eidnes' tortious interference with Kelly's contractual relationship with its customers and its business relationships and expectancies with its customers and prospective customers. To prove a claim for tortious interference with contractual relations, Kelly must prove "that a contact existed, that it was breached, that [defendant] instigated the breach and that it did so without justification." *Trepel v. Pontiac Osteopathic Hosp.*, 135 Mich. App. 361, 374; 354 N.W.2d 341 (1984) (citations omitted).

With respect to the tortious interference with business relations and expectancies, "[o]ne who intentionally and improperly interferes with another's prospective contractual relation . . . is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation, or (b) preventing the other from acquiring or continuing the prospective relation." *Winiemko v. Valenti*, 203 Mich. App. 411, 417; 513 N.W.2d 181, 184 (1994). The elements for tortious interference with a business relationship are:

    1)     the existence of a business relationship with a third party;

2)     defendant's knowledge of the business relationship;

3)     intentional and/or improper interference by the defendant that causes a breach, disruption, or termination of the business relationship; and

4)     damage to the plaintiff, whose business relation has been breached, disrupted, or terminated.

*Liberty Heating & Cooling, Inc. v. Builders Square, Inc.*, 788 F. Supp. 1438, 1447 (E.D. Mich. 1992).

Kelly possesses valid agreements with its customers and has valid business expectancies with its customers and prospective customers.    Eidnes is aware of Kelly's contractual relationships and expectancies with its customers and prospective customers.  Her interference with these relationships is therefore unjustified and wrongful.  Her actions are intentional and malicious; otherwise, she would have ceased her violative conduct.    Based on these circumstances, Kelly also will succeed on the merits of its claim of tortious interference against Eidnes.  As a result, the preliminary injunction should be granted.

**B.     If Preliminary Injunctive Relief Is Not Granted, Kelly Will Suffer Irreparable Injury**

Kelly will suffer irreparable harm if a preliminary injunction is not granted.  In discussing irreparable harm, the Michigan Supreme Court has noted that:

> An injury to be irreparable need not be such as to render its repair physically impossible; but it is irreparable when it cannot be adequately compensated in damages, or when there exists no certain pecuniary standard for the measurement of damages due to the nature of the right or property injured.

*Ainsworth v. Hunting & Fishing Club*, 153 Mich. 185; 116 N.W. 99 (1908) (citations omitted). Similarly, Judge Cohn, in *Superior v. Walling*, 851 F. Supp. 839, 847 (E.D. Mich. 1994), stated that "[l]oss of customer goodwill and fair competition can support a finding of irreparable harm. Such losses are difficult to calculate." *Id.* at 847.  Furthermore, this Court in *Noretto* held:

15

> [I]t is entirely unreasonable to expect Noretto to work for a direct competitor in a
> position similar to that which he held with Kelly, and forego the use of the
> intimate knowledge of Kelly's business operations. . . . Absent an order for
> preliminary injunction, it appears that Defendant's expansive knowledge of
> Kelly's business systems and operations will result in a loss of the customer
> goodwill developed by Kelly. Furthermore, Kelly will be forced to labor under
> the burden of unfair competition as a result of the informational asymmetry
> presented by its direct competitor having an employee with intimate knowledge of
> its operations.

495 F. Supp. 2d at 659. *See also Lowry,* 984 F. Supp. at 1116 (Defendant's "knowledge

is <u>bound</u> to have significant adverse impact on Lowry's business."); *Walling,* 839 F. Supp. at

847-48 (finding that "use of this knowledge [client confidential information] would enable

[Defendant] effectively to undercut [Superior's] rates while providing the same services

provided by [Superior].")

Unless enjoined by this Court, Eidnes will continue to use Kelly's confidential

information and trade secrets in violation of her contractual and fiduciary duties to Kelly. As

described above, Eidnes acquired detailed confidential and proprietary information and trade

secrets of Kelly. Her disclosure of this information and violation of her Agreement will inflict

irreparable harm on Kelly. The courts have recognized that it would be totally unreasonable to

expect Eidnes to work in a similar position for a direct competitor and ignore her intimate

knowledge of Kelly's confidential business information. Therefore, because of Eidnes' breach

of her Agreement and misappropriation of Kelly's trade secrets, Kelly is suffering irreparable

harm to its customer goodwill and competitive position. Kelly has no adequate remedy at law

for Eidnes' misconduct because the injuries that Kelly has suffered and will continue to suffer in

connection with the loss of its customer goodwill are so indefinite and speculative as to be

incapable of exact proof. *See Chem-Trend v. McCarthy,* 780 F. Supp. 463 (E.D. Mich. 1991)

(finding that "it would not be possible to measure plaintiff's actual loss of customers and goodwill").

**C.    The Harm to Kelly If a Preliminary Injunction Is Denied Outweighs the Harm to Eidnes If It Is Granted**

The injunction requested by Kelly only prohibits Eidnes from working for Beacon Hill in any market area that she worked or had responsibility for while employed by Kelly, from using Kelly's confidential information and trade secrets, and from avoiding her contractual, statutory, and fiduciary obligations. It merely prevents Eidnes from committing wrongful acts that interfere with Kelly's contractual and property rights. Eidnes is free to seek employment that does not violate her obligations or involve the use or disclosure of Kelly's trade secrets and confidential information. Therefore, there can be no harm to Eidnes.

On the other hand, Kelly faces irreparable harm if an injunction is not granted. The loss to Kelly of customer goodwill or any confidential information is incalculable. The harm to Kelly should this Court deny a preliminary injunction far outweighs the harm to Eidnes should it be granted. *See Noretto*, 495 F. Supp. 2d at 660 (prohibiting defendant from working for a competitor in numerous counties in Oregon and Washington and reasoning that "although Defendant may not be able to pursue his first choice with respect to an employment or location, Defendant can readily comply with the terms of the Agreement and find a suitable employment position").

**D.    The Public Interest Supports the Issuance of a Preliminary Injunction**

The public interest in protecting confidential information and enforcing valid employment contracts justifies preliminary injunctive relief. If the courts do not enjoin parties to such agreements from violating them and from misappropriating trade secrets, then the statute becomes a dead letter.

The public also has an interest in proper adjudication of disputes. The object of a preliminary injunction is "to preserve the status quo (*i.e.*, the uncontested status which precedes the pending controversy)." *Detroit v. Salaried Phys, UAW*, 165 Mich. App. 142, 151; 418 N.W.2d 679 (1987). In this case, the status quo to be preserved is the status that preceded Eidnes' misappropriation of Kelly's confidential business information and breach of contract. A preliminary injunction would simply insure that no further injury will result to Kelly pending a final hearing on the merits. Thus, the public interest supports not only the enforcement of reasonable agreements, but also the enjoining of violations of such agreement prior to a trial.

### IV. CONCLUSION

Based on the foregoing, Kelly requests that this Court grant the relief requested in the Verified Complaint, and enter a Temporary Restraining Order and then a Preliminary Injunction.

Respectfully submitted,

BUTZEL LONG

James J. Giszczak (P46917)
Katherine D. Goudie (P62806)
150 West Jefferson, Suite 100
Detroit, MI 48226
313/983-7475
giszczak@butzel.com
goudie@butzel.com
Attorneys for Plaintiff

Dated: November 21, 2007
969462





# AGREEMENT WITH
# FULL-TIME EMPLOYEES
# OF KELLY® CORPORATIONS

# Statement of Purpose

In order to provide the highest quality service to its customers and maintain its leadership position in the temporary help industry, Kelly Services spends substantial time, effort and money in recruiting and training its employees, and developing programs and services to meet its customers' needs. All Kelly employees have an obligation to help protect this investment.

\* \* \* \*

In consideration of my employment with Kelly Services, Inc., Kelly Assisted Living Services, Inc., or any other Kelly corporation ("Kelly"), I agree as follows:

(1)  Unless required by my job at Kelly, I will never disclose, use, copy or retain any confidential business information or trade secrets belonging to Kelly, Kelly's customers or Kelly's suppliers. This includes customer and employee lists; sales, service, recruiting and training techniques and manuals; sales and marketing strategies; computer programs; financial data and other similar information.

(2)  While I am working for Kelly, I will not solicit any of Kelly's customers or employees for a competing business, and I will not compete against Kelly or associate myself with any Kelly competitor as an employee, owner, partner, stockholder\*, investor\*, agent or consultant. These same limitations apply for one year after I leave Kelly in any market area in which I worked or had responsibility during the last five years of my employment with Kelly.

(3)  Kelly may use and publish my name and picture, including audio or video tape recordings, for purposes relating to its business without a specific release from me.

(4)  Any new idea, invention, improvement, or copyrightable work I create, develop or help develop belongs to Kelly if it relates to Kelly's business. If any such development or creation occurs during my employment or up to one year after I leave Kelly, I will promptly disclose and explain it and assign to Kelly all rights I may have in it without additional compensation.

(5)  Either of us may end the employment relationship at any time with or without cause, subject to applicable laws concerning non-discrimination with regard to age, race, sex and the like. However, Kelly shall give me a minimum of two weeks' notice (or two weeks' wages in lieu of notice) unless there is reason for immediate termination, such as dishonesty, serious misconduct or a significant violation of corporate policy.

\*Except up to 2% of the stock of a publicly traded company.

(6)  If I break this Agreement, Kelly is entitled to recover as damages from me the greater of the amount of the financial loss which Kelly suffers as a result or the amount of the financial gain which I receive. I will pay Kelly's reasonable attorney's fees and costs involved in enforcing this Agreement.

(7)  This Agreement will be interpreted and enforced under Michigan law. If a court finds any part of this Agreement invalid, the rest of it will be enforced to the extent permitted.

(8)  I will make any claim and bring any action or lawsuit I may have relating to my employment with Kelly within one year after leaving my employment. I agree to waive any statute of limitation to the contrary.

(9)  This Agreement takes the place of all previous employment agreements. Any changes must be in writing, and must be signed by me and by two senior corporate officers of Kelly.

(10)  My signature below indicates that I have read, understood and agreed to the provisions of this Agreement.


KELLY SERVICES, INC.
KELLY ASSISTED LIVING SERVICES, INC.

*Cynthia C. Eidnes*
Employee Signature

*T. C. Adderley*
T. E. Adderley
President and Chief Executive Officer

*Cynthia C. Eidnes*
Employee Name (typed/printed)

███████████
Social Security Number

KLR-Mpls      34W1
Branch/Dept. Name        Branch/Dept. Number

Date: 5/1/00

**INSTRUCTIONS**
Ask the employee to sign three forms:
* Send one to Compensation, Benefits and Employee Information.
* Give one to the employee for his/her records.
* Retain one in the branch.





# Terms and Conditions for Direct Hire Placements

1. **Placement Fee:**

**REDACTED**

3. **Confidentiality:**

**Terms and Conditions for Direct Hire Placements**
**Page Two**

**Time on Assignment**          **Percentage Fee**

**REDACTED**

| WEEKLY SALES TEMP WORKING REPORT | | | | | |
|---|---|---|---|---|---|
| Begin Week September 24 - 30, 2007 | | | | | |
| Branch 34W1 & 16W1/16W2 | | | | | |
| SUBMITTED BY: Michael Tracy | | | | | |
| | | | Blue boxes are automatically calculated--do not change! | | |
| TEMP PLACEMENTS THIS WEEK: | | | | | |
| Client Names/Position | Name of Candidates | Pay | Bill | Start Date | Mark-Up |

REDACTED

September 24 - 30, 2007 Weekly Report

Page 3

REDACTED

| COMPANY/FIRM | TEMP NAME | DESCRIPTION | PAY RATE | BILL RATE | MARK UP | Hire Date | C-Name | Client Phone | Home |
|---|---|---|---|---|---|---|---|---|---|
| Perm Placements This Week | | | | | | | | | |
| 1 | | | | | | | | | |
| 2 | | | | | | | | | |
| 3 | | | | | | | | | |

September 24 - 30, 2007 Weekly Report

Page 11

**REDACTED**

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| PERM FEES | | | | | | | | | | |
| | | | | | | | | | | |
| GROSS PROFIT THIS WK | | | | | | | | | | |
| | | | | | | | | | | |
| TOTAL BILL RATE PER HR | | | | | | | | | | |
| TOTAL BILL RATE THIS WEEK | | | | | | | | | | |
| TOTAL PAY RATE PER HR | | | | | | | | | | |
| TOTAL PAY RATE THIS WK | | | | | | | | | | |
| TOTAL PGP THIS WEEK | | | | | | | | | | |



Home | Contact U



**BEACON HILL STAFFING GROUP**

Search

About Us    Specialties    Find a Job    Submit Resume    For Employers    For Candidates    For Employees

**SEARCH FOR A JOB**

Keyword(s)

Choose Job Type

Choose Location

Choose Specialty

Advanced Search    **Search**

**Specialties**

Administrative

Accounting & Finance

Funds & Investments

Public Accounting

Banking

Human Resources

Legal - Support

Legal - Paralegal

Legal - Attorney

Technology

**Manage Timesheets**

## Evolution



Beacon Hill growth – addressing ever changing constituent needs.

▶ Introd

▶ Our St

▶ Leader

▶ Join O

▶ Specia

▶ Locatio

▶ News

▶ Evolut

▶ Privac



Have Qu

Contact a B search or professional

### 2007

- Named an Inc 500 company for third year in a row
- Minneapolis office established
- Named Pacesetter and #5 of top 60 growth companies by BBJ
- Washington, DC office established

### 2006

- Named an Inc 500 company for second

- Ranked #4 on Area's Largest Executive Search Firms list and #8 on Area's Fastest Growing Private Companies list by Boston Business Journal

## 2005

- Named an Inc 500 company for first time
- Chicago office established
- Beacon Hill Technologies established to provide contract and direct placement (permanent) services to the IT community on a national basis
- Named to Boston Business Journal's Largest Temporary Placement Firms list
- Named #1 on Area's Fastest Growing Private Companies list and #5 on Area's Largest Executive Search Firms list by Boston Business Journal

## 2004

- Beacon Hill HR established to provide contract and direct placement (permanent) services to the HR community

## 2003

- Beacon Hill Financial and Beacon Hill Legal established to provide contract, temporary and direct placement

- Moved corporate HQ to historic Beacon Hill in Boston

**2002**

- Added temporary services offering for clients

**2000**

- Beacon Hill Associates established to provide administrative support personnel on a direct placement (permanent) basis to the Boston marketplace

© Copyright 2007, Beacon Hill Staffing Group, LLC. All Rights Reserved

SiteMap | Pri
Contact Us

Home | Contact U



**BEACON HILL**
**STAFFING GROUP**

Search

About Us    Specialties    Find a Job    Submit Resume    For Employers    For Candidates    For Employees

**SEARCH FOR A JOB**

Keyword(s)

Choose Job Type

Choose Location

Choose Specialty

Advanced Search    **Search**

**Specialties**

Administrative

Accounting & Finance
Funds & Investments
Public Accounting
Banking

Human Resources

Legal - Support
Legal - Paralegal
Legal - Attorney

Technology

**Manage Timesheets**

## Leadership

**Andrew Wang**, *Chief Executive Officer*

**Charlie Cain**, *Managing Director* - BH Associates

**Sherri Pearl**, *Principal & Senior Consultant* - BH Associates

**Heather Harrold**, *Division Manager* - BH Associates

**Amy Van Sicklin**, *Managing Director* - BH Financial

**Tim Bolduc**, *Division Manager* - BH Financial

**Michael Pickens, CPA**, *Managing Director* - BH Financial

**John David Tarbox**, *Managing Director* - BH Legal

**Joe Kanka**, *Division Director* - BH Legal

**Cindy Eidnes, JD** , *Division Director* - BH Legal

**Jeff McLaren**, *Managing Director* - BH Technologies

**Jeff Rosen**, *Division Director* -   H

▸ **Introd**

▸ **Our St**

▸ **Leader**

▸ **Join O**

▸ **Specia**

▸ **Locatic**

▸ **News**

▸ **Evolut**

▸ **Privac**



*Have Qu*

Contact a B
search or
professional

Our Evol



See How W
Grown.

support centers in Washington, DC.  Mr. Kanka received a Bachelor of Arts degree in political science from Manhattanville College and a Master of Science degree in public relations management from American University.

back to top

**Cindy Eidnes, JD**, *Division Director*

Ms. Eidnes is responsible for directing Beacon Hill Legal in Minneapolis.  She has been a major force in the Twin Cities legal staffing market since 1993, providing temporary attorneys to both firms and corporations covering large scale document reviews to high level attorney requirements within various areas of substantive legal expertise.  She also specializes in the direct placement of attorneys and has staffed paralegals on both a direct and temporary basis.  Prior to joining Beacon Hill, Ms. Eidnes became known as a top provider of contract and temporary attorneys, opening and managing the first legal staffing company in the Twin Cities to provide document review project work and high level temporary placements.  Ms. Eidnes began her career as a litigator within a law firm in Denver and also worked in-house on a long term temporary basis managing

Connecticut.  She is very active in the local legal community, currently serving as a co-chair for the Professional Development Committee of Minnesota Women Lawyers and as a member of the MN-ACC Career Management Committee.  Ms. Eidnes received her undergraduate degree from the University of Minnesota and her JD from Stanford Law School.

back to top

### Jeff McLaren, *Managing Director*

Mr. McLaren is responsible for leading and directing Beacon Hill Technologies and its national expansion, overseeing IT staffing service/delivery, sales and daily operations, while personally focusing on key account management for clients spanning the country, from San Francisco to Chicago to Dallas to Boston.  He is regarded as one of the best national providers of contract IT talent, known for consistently delivering high quality professionals across the country in project management, programming/development, business analysis, database, infrastructure, QA, help desk/support and ERP roles. Prior to joining Beacon Hill, Mr. McLaren was the top account executive at a national IT



1 of 1 DOCUMENT

KELLY SERVICES, INC., Plaintiff, v. NED NORETTO, Defendant.

CIVIL CASE NO. 07-12389

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
MICHIGAN, SOUTHERN DIVISION

*495 F. Supp. 2d 645; 2007 U.S. Dist. LEXIS 49547*

July 9, 2007, Decided
July 9, 2007, Filed

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** In a diversity suit, plaintiff employer moved for a preliminary injunction under *Fed. R. Civ. P. 65(a)*. Defendant former employee moved to dismiss for lack of personal jurisdiction pursuant to *Fed. R. Civ. P. 12(b)(2)* and to dismiss or transfer for improper venue pursuant to *28 U.S.C.S. §§ 1391, 1406*. The complaint alleged the employee had violated the Michigan Uniform Trade Secrets Act (MUTSA), *MCL 445.1901 et seq.*, by stealing trade secrets.

**OVERVIEW:** While working as a regional sales manager, the employee had signed an agreement containing noncompete, non-solicit, and nondisclosure clauses. Five years later, he resigned and began working for the employer's direct competitor. The employer alleged that the employee was using confidential information contained on a flash drive that the employee had retained after resigning, including client lists, in violation of their noncompete agreement. The court held that the employee had transacted enough business in Michigan for it to exercise personal jurisdiction over him under *MCL 600.705(1)*. Inter, alia, although he worked in Oregon, he was recruited and hired at the employer's Michigan headquarters and traveled there for training, which established minimum contacts with the State. For the same reasons, the employee failed to meet his burden of showing that venue was improper in Michigan under *28 U.S.C.S. § 1391(a)(2)*. The court found the employer had a likelihood of success on the merits of its MUTSA claim because the one-year noncompete agreement was enforceable and preliminarily enjoined the employee from working for the competitor in the geographical areas in which he had worked.

**OUTCOME:** The court denied the employee's motions to dismiss for lack of personal jurisdiction and improper venue. The court granted the employer a preliminary injunction to remain in effect until a date certain, enjoining the employee from working for the employer's competitor(s) within a specified geographical area and ordered the employee to return the employer's property and to preserve evidence. The court ordered the employer to post additional bond.

**COUNSEL:** [**1] For Kelly Services, Incorporated, Plaintiff: James J. Giszczak, LEAD ATTORNEY, Butzel Long (Detroit), Detroit, MI, Katherine D. Goudie, Butzel Long (Detroit), Detroit, MI.

For Ned Noretto, Defendant: Kirk M. Liebengood, Kirk M. Liebengood (Flint), Flint, MI.

**JUDGES:** HONORABLE PAUL V. GADOLA, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** PAUL V. GADOLA

**OPINION**

[*648] **ORDER**

Now before the Court are Plaintiff Kelly Services, Inc.'s ("Kelly") motion for a preliminary injunction pursuant to *Federal Rule of Civil Procedure 65(a)*; Defendant Ned Noretto's ("Noretto") motion to dismiss for lack of personal jurisdiction pursuant to *Federal Rule of Civil Procedure 12(b)(2)*; and Defendant Noretto's motion to dismiss or transfer for improper venue, pursuant to *28 U.S.C. §§ 1391, 1406*. [1]

1    The Court notes that Defendant has not made an argument that, pursuant to *28 U.S.C. § 1404*,

495 F. Supp. 2d 645, *; 2007 U.S. Dist. LEXIS 49547, **

venue should be transferred to the District of Oregon for the convenience of the parties and the witnesses.

For the reasons stated below, the Court will grant Plaintiff's request for a preliminary injunction and deny Defendant's motions to dismiss or transfer venue.

## I. Factual Background

Plaintiff Kelly Services, Inc., is a Delaware corporation with its principal place [**2] of business in Troy, Michigan. Defendant Ned Noretto is a citizen and resident of Oregon. Noretto has been engaged in the "staffing industry" for twenty-one years and was employed by Kelly from January 28, 2002 through May 4, 2007. Noretto was employed by Kelly as a Regional Manager for the Major Markets Division, working out of the Portland, Oregon branch office. Noretto's geographic area of responsibility included Multnomah, Clackamas, Washington, Columbia, Clatsop, Marion, Yamhill, Linn, Tillamoook, Lincoln and Wasco counties in the State of Oregon, as well as Clark, Skamania, and Cowlitz counties, in the State of Washington.

At the time Defendant Noretto began employment with Kelly in 2002, Noretto executed a document entitled "Agreement with Full Time Employees of Kelly Corporations" ("Agreement"). The Agreement provides, in pertinent part:

> In consideration of my employment with Kelly Services, Inc., Kelly Assisted Living Services, Inc., or any other Kelly corporation ("Kelly"), I agree as follows:

> (1) Unless required by my job at Kelly, I will never disclose, use, copy or retain any confidential business information or trade secrets belonging to [*649] Kelly, Kelly's customers or Kelly's [**3] suppliers. This includes customer and employee lists; sales, service, recruiting and training techniques and manuals; sales and marketing strategies; computer programs; financial data and other similar information.

> (2) While I am working for Kelly, I will not solicit any of Kelly's customers or employees for a competing business, and I will not compete against Kelly or associate myself with any Kelly competitor as an employee, owner, partner, stockholder, investor, agent or consultant. These same limitations apply for one year after I leave Kelly in any market area in which I worked or had responsibility during the

last five years of my employment with Kelly.

Pl.'s Verified Compl., p. 15

On April 2, 2007, after five years of employment with Kelly, Defendant submitted a verbal resignation to his supervisor, located in Troy, Michigan. Although Defendant maintains that he resigned only because he was about to be fired–a contention Defendant denies–Noretto does not dispute that his resignation was voluntary. The resignation was to be effective May 4, 2007.

The parties dispute the exact manner in which Defendant departed his employment with Kelly. Plaintiff alleges that when Noretto's supervisor [**4] questioned Noretto about his future plans for employment following resignation, Noretto indicated that he had no other plans for employment at that time, that he simply couldn't do that type of work anymore, and that he was taking an extended vacation with his family. Plaintiff further alleges that Defendant was reminded of the pertinent noncompete, non-solicit, and non-disclosure clauses in the Agreement. Defendant disputes that he ever participated in an exit interview upon his resignation from Kelly or that the clauses were specifically brought to his attention.

Shortly after Defendant resigned his employment from Kelly on May 4, 2007, Defendant allegedly began working for Volt Information Service, Inc. ("Volt"), a direct competitor of Kelly in the staffing industry. Kelly became aware of Defendant's employment with Volt when an email was exchanged between employees of the local offices of Volt and Kelly. In the email between the companies regarding a mutual client that Noretto had allegedly serviced while with Kelly, Noretto was included as a recipient in his capacity as a Volt employee. Therefore, Plaintiff became aware that Noretto had taken up employment with its direct competitor [**5] Volt, and that Noretto was possibly soliciting his former clients.

Kelly alleges that, as part of his employment and specific position with Kelly, Noretto had access to, and utilized on a regular basis, Kelly's confidential and proprietary information including information concerning Kelly's business affairs, customer lists, operational procedures, marketing and sales strategies and practices, contractual details for customers, regional customer pricing and profit margins, recruiting plans, and recruiting sources. Additionally, Kelly claims that Noretto acquired intimate knowledge concerning Kelly's customers' preferences and service needs, and had extensive contact with two of Kelly's largest and most critical accounts. Plaintiff also alleges that just two weeks before Defendant's separation, Defendant received a "flash drive" con-

Case 2:07-cv-14989-JF-MKM   ECF No. 3   filed 11/21/07   PageID.79   Page 47 of 50

Page 3

495 F. Supp. 2d 645, *; 2007 U.S. Dist. LEXIS 49547, **

taining work proposals for Kelly's customers and prospective customers and other confidential information and trade secrets of Kelly. Plaintiff contends that, despite requests to do so, Defendant has failed to return the flash drive containing the information. Plaintiff asserts that the information to [*650] which Noretto was exposed in his position with Kelly is [**6] of great value, not only to Kelly, but also to its competitors who do not possess, or have access to, this information.

Kelly now claims that as a result of the aforementioned factual developments, Noretto is in violation of the terms of the Agreement he signed upon employment with Kelly and that he is in violation of the Michigan Uniform Trade Secrets Act ("MUTSA"), *M.C.L. § 445.1901, et seq.* Kelly alleges that it faces a substantial risk that Noretto will unlawfully use Kelly's client and customer information and trade secrets to Kelly's competitive disadvantage. Kelly argues that it stands to lose employees, clients, and customers; lose confidential, proprietary and trade secret information; lose goodwill and referral business of its clients and customers; and suffer a decrease in revenues in an amount that cannot readily be ascertained.

## II. Procedural Background

On June 6, 2007, following Plaintiff's motion for a temporary restraining order, the Court conducted an exparte hearing and issued the order. *Order Granting Temporary Restraining Order* [docket entry # 5]. The Court also scheduled a hearing for June 14, 2007 on Plaintiff's motion for a preliminary injunction. At the June 14, [**7] 2007 preliminary injunction hearing, each side made brief remarks and then stipulated to an extension of the TRO until July 9, 2007. The Court ordered further briefing of the parties' positions and set a hearing for the pending matters on July 9, 2007.

Plaintiff now seeks a preliminary injunction, restraining and enjoining Defendant Noretto, directly or indirectly:

(a) from working for, or acting as, and employee, partner, stockholder, investor, owner, director, agent, or consultant for a competitor of Kelly (including, but not limited to, Volt) within Multnomah, Clackamas, Washington, Columbia, Clatsop, Marion, Yamhill, Linn, Tillamook, Lincoln and Wasco Counties in the State of Oregon and Clark, Skamania, and Cowlitz Counties it the State of Washington, until May 4, 2008

(b) from soliciting or performing services for any Kelly customer for a competing business until May 4, 2008

(c) from soliciting or being involved in the recruitment or hire of any Kelly employee for a competing business (including but not limited to Volt) until May 4, 2008

(d) from ever using or disclosing any of Kelly's confidential, proprietary or trade secret information or property;

(e) from interfering, in any way, [**8] with any current or prospective customer or employee relationship of Kelly; and

(f) from breaching any fiduciary obligation and duties of loyalty to Kelly, including but not limited to, appropriating any business opportunity of Kelly, engaging in deceptive acts or statement with regard to Kelly's ability, experience and personnel, otherwise attempting to gain unfair advantage in the employee leasing and staffing business, or disclosing or using Kelly's confidential or proprietary information.

Pl.'s Verified Compl., p. 10.

Kelly also requests that the Court require Noretto to return all Kelly property to Kelly, including all originals and copies of tangible property, proprietary documents, trade secrets, confidential information, discs, notes, client files, client information, employment information, business development information, request for proposal, request for bid, client correspondence, meeting minutes, notes of site visits, marketing data, prospect meeting data, proposals, faxes, financial information, pricing contracts, marketing brochures, [*651] marketing database, marketing plans, costs, customer lists, customer information, internal weaknesses, prospect lists, client lists, employee [**9] lists, alliance relationships, competitive bid information, client contact lists, sales leads, prospective employee lists, business plans, profit margin, and forecasting information, strategic planning, project costs, and any other Kelly data kept in any form or media whatsoever. *Id.*

Defendant has now filed two motions of his own. First, Defendant asserts that because he lives and works in Oregon, because his only actions in Michigan consisted of attending mandatory training for Kelly in Michigan, and because his actions have had no conse-

495 F. Supp. 2d 645, *; 2007 U.S. Dist. LEXIS 49547, **

quences in Michigan, the Court lacks personal jurisdiction over him. Second, Defendant maintains that because there is no property at issue in this matter and because the events and conduct at issue all occurred in and around Portland, Oregon, venue is proper in Oregon. Therefore, Defendant asks this Court to direct that this case be dismissed or transferred to the District of Oregon.

The Court will first address the issue of personal jurisdiction.

## III. Personal Jurisdiction

Defendant Noretto moves to dismiss the case for lack of personal jurisdiction, pursuant to *Federal Rules of Civil Procedure 12(b)(2)*. Defendant maintains that personal jurisdiction [**10]** is inappropriate in Michigan. Defendant argues that he is a resident of Oregon and has only come to Michigan on several sporadic occasions when required to do so as part of his employment with Kelly. Furthermore, Noretto argues that there was no act done or consequences that occurred in the State of Michigan as part of the basis for this action.

## A. Legal Standard

Plaintiff bears the burden of establishing personal jurisdiction. *Bird v. Parsons, 289 F.3d 865, 871 (6th Cir. 2002); MCNIC Oil & Gas Co. v. IBEX Resources Co., 23 F. Supp. 2d 729, 732 (E.D. Mich. 1998)* (Gadola, J.). The standard for evaluating whether personal jurisdiction exists depends upon whether the Court conducts an evidentiary hearing on the issue. In this case, because the Court has not conducted an evidentiary hearing on this issue, Plaintiff "need only make a prima facie showing of jurisdiction." *Bird, 289 F.3d at 871* (citation and internal quotation omitted). Under this standard, the United States Court of Appeals for the Sixth Circuit has stated that the pleadings and affidavits should be considered in the light most favorable to Plaintiff and has characterized Plaintiff's burden of establishing jurisdiction as "relatively [**11]** slight." *Welsh v. Gibbs, 631 F.2d 436, 438-39 (6th Cir. 1980)*.

In diversity cases such as the instant one, courts look to the law of the forum state to determine whether personal jurisdiction exists. *Nationwide Mutual Ins. Co. v. Tryg Int'l. Ins. Co., Ltd., 91 F.3d 790, 793 (6th Cir. 1996)*. The nature of Defendant's contacts with the forum determine whether personal jurisdiction is characterized as general or specific. *Conti v. Pneumatic Prods. Corp., 977 F.2d 978, 981 (6th Cir. 1992)*. General jurisdiction exists when a defendant exercises continuous and systematic contacts with the forum state, while specific jurisdiction exists when a plaintiff's claims arise out of or relate to a defendant's conduct with the forum state. *See*

*id.; Kerry Steel, Inc. v. Paragon Indus., 106 F.3d 147, 149 (6th Cir. 1998)*.

To establish personal jurisdiction, Plaintiff "must show that (1) the Michigan long-arm statute supports the Court's exercise of personal jurisdiction and (2) the [*652]** exercise of jurisdiction would not violate the *Due Process Clause of the Fourteenth Amendment*." *Viches v. MLT, Inc., 127 F. Supp. 2d 828, 830 (E.D. Mich. 2000)* (Gadola, J.). *See also Neogen Corp. v. Neo Gen Screening, Inc., 282 F.3d 883, 888 (6th Cir. 2002)*.

Using [**12]** the "relatively slight" threshold standard, *see Welsh, 631 F.2d at 438-39*, the Court must initially examine the first of the two requirements for establishing personal jurisdiction: whether the Michigan long-arm statute supports the Court's exercise of personal jurisdiction. *See Viches, 127 F. Supp. 2d at 830*.

Under the law of the forum where the Court is located, the Michigan long-arm statute permits limited personal jurisdiction over an individual or corporation, enabling the court to render personal judgments against the individual or corporation, when the cause of action arises out of the "transaction of any business within the state." *M.C.L. § 600.705*. This Court has previously noted that the standard of the Michigan long-arm statute is "extraordinarily easy to meet." *Viches, 127 F. Supp. 2d at 830 (Gadola, J.)*. Indeed, the phrase, "any business within the state" has been very broadly interpreted. The Sixth Circuit has held that where a defendant does even the "slightest act of business in Michigan," the first statutory criterion for personal jurisdiction under the Michigan long-arm statute is satisfied. *Lanier v. Am. Bd. of Endodontics, 843 F.2d 901, 906 (6th Cir. 1988)*.

The next [**13]** step is to consider whether Defendant has "minimum contacts" with the forum state such that "the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington, 326 U.S. 310, 66 S. Ct. 154, 90 L. Ed. 95 (1945)*. The Sixth Circuit has established a three-part test for this analysis. *See Cole v. Mileti, 133 F.3d 433, 436 (6th Cir. 1998); Southern Machine Co. v. Mohasco Indus., Inc., 401 F.2d 374, 381 (6th Cir. 1968)*. First, the defendant must purposefully avail himself of the privilege of conducting activities within the forum state. *Cole, 133 F.3d at 436*. Second, the cause of action must arise from the defendant's activities there. *Id.* Third, the acts of the defendant or consequences caused by the defendant's actions must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant fundamentally fair. *Id.*

## B. Analysis

In the present case, Defendant has transacted business within the State of Michigan, providing sufficient

Case 2:07-cv-14989-JF-MKM    ECF No. 3    filed 11/21/07    PageID.81    Page 49 of 50

Page 5
495 F. Supp. 2d 645, *; 2007 U.S. Dist. LEXIS 49547, **

grounds for the Court to exercise personal jurisdiction over him under *M.C.L. § 600.705(1)*. Defendant was recruited and hired out of Plaintiff's Michigan offices. When he was hired [**14] by Kelly, he signed the Agreement containing the non-compete, non-solicit, and non-disclosure clauses, accepting those terms as the terms of his employment with the Michigan headquartered Kelly Services, Inc. Clearly, each of those clauses are meant to protect the interests and information of Michigan based Kelly. Furthermore, during his five year career at Kelly, Defendant attended training sessions in Michigan; Defendant called, faxed, or emailed on weekly or daily basis his Michigan based supervisors; and Defendant routinely accessed information on Kelly's Michigan based computer servers in his efforts to transact business in his position with Kelly. It is information that was obtained in the training sessions, through Kelly's Michigan based servers, and through Defendant's actions with the Michigan company that Kelly now seeks to protect in this action. Additionally, there can be little doubt that Noretto's alleged breach of the Agreement and alleged misappropriation of trade secrets [*653] have a direct effect on Michigan based Kelly Services, Inc. Such contacts are patently sufficient to surmount the "transaction of any business within the state" threshold for personal jurisdiction [**15] under the Michigan long arm statute. *M.C.L. § 600.705*. See also *ACS Consultant Co. v. Williams, Case No. 06-11301, 2007 U.S. Dist. LEXIS 15120, 2007 WL 674608 at *7 (E.D. Mich. Mar. 5, 2007)*.

Additionally, in his employment with Kelly, Noretto served in a "high level position as Kelly's Regional Manager for the Major Markets Division." Pl.'s Resp. Br., Ex. A, Aff. of Sheen Watkins P 5 [docket entry 17-3, p. 2]. Holding such a managerial position with Kelly, a business with its principal place of business in Michigan, subjects Defendant to the reach of the Michigan long arm statute under *MCL § 600.705(6)*.

Accordingly, because the Court finds that limited personal jurisdiction under the Michigan long arm statute is present, an analysis of whether the Court has general personal jurisdiction is unnecessary. Furthermore, the Court need not consider Plaintiff's argument as to whether Defendant waived any objection to personal jurisdiction. See *Fed. R. Civ. P. 12(h)*.

Turning next to consider whether Defendant has "minimum contacts" such that "the maintenance of the suit does not offend traditional notions of fair play and substantial justice," *Int'l Shoe Co. v. Washington, 326 U.S. 310, 66 S. Ct. 154, 90 L. Ed. 95*, the Court finds that Defendant [**16] does have sufficient minimum contacts. Defendant purposefully availed himself of the privileges of conducting activities within the forum state when he became employed by a company headquartered

in Michigan; entered into a non-compete, non-solicit, and non-disclosure agreement with Kelly; entered into the Agreement containing a Michigan choice of law provision; continuously reported to supervisors working in Michigan; made several trips to Michigan for training purposes, and frequently used information stored on the company's Michigan based servers. *Cole, 133 F.3d at 436*. See also *Burger King Corp. v. Rudzewicz, 471 U.S. 462, 482, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985)* (finding: (1) that a Florida District Court had personal jurisdiction over a Michigan franchisee whose only contacts with Florida were a franchise agreement with the Florida corporation and communications to Florida via telephone calls and letters and (2) that a choice of law provision should not "be ignored in considering whether a defendant has 'purposefully invoked the benefits and protections of a State's law'" for jurisdictional purposes); *Superior Consulting, Inc. v. Walling, 851 F. Supp. 839, 844 (E.D. Mich. 1994)* (finding that an employee that [**17] negotiated an employment contract with a Michigan company, made numerous trips to Michigan while employed, and was in frequent contact with the employer's Michigan office via telephone, voice mail, fax, mail, and e-mail, had sufficient minimum contacts).

Therefore, after a thorough consideration of the matter, the Court finds that the Sixth Circuit's three-part test for determining whether the Court may exercise limited jurisdiction over Defendant in accordance with Due Process is satisfied. *Cole, 133 F.3d at 436*. Plaintiff has presented a prima facie case that Defendant has transacted business in the State of Michigan for the purpose of the Michigan long arm statute and that those acts have given rise to the present action. Additionally, because Defendant "purposefully avail[ed] [himself] of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws," *Viches, 127 F. Supp. 2d at 830-31* (quoting *Int'l Shoe Co., 326 U.S. at 316*), he created minimum contacts with Michigan such that the "maintenance of the suit does not offend traditional notions of [*654] fair play and substantial justice." *Int'l Shoe Co., 326 U.S. at 316*.

Accordingly, [**18] the Court will deny Defendant's motion to dismiss the case for lack of personal jurisdiction.

## IV. Change of Venue

Defendant next moves this Court to dismiss this action for improper venue or, in the alternative, to transfer venue to the District of Oregon. See *28 U.S.C. §§ 1391, 1406; Fed. R. Civ. P. 12(b)(3)*. Defendant argues that venue in the Eastern District of Michigan is improper because Defendant resides in Oregon and there are no events that occurred in Michigan or property located in

Michigan that are the subject of this suit. *See 28 U.S.C. § 1391.*

## A. Legal Standard

Defendant bears the burden of establishing that venue is improper . *Amphion Inc. v. Buckeye Elec. Co., 285 F. Supp. 2d. 943, 945 (E.D. Mich. 2003)* (Gadola, J.) (citing 17 James Wm. Moore *et al.*, Moore's Federal Practice P 110.01 (3d ed.1997)).

In a diversity action, venue must be proper under *28 U.S.C. § 1391(a)*, which states:

> A civil action wherein jurisdiction is founded only on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the [**19] events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant is subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought.

*28 U.S.C. § 1391 (a).*

## B. Analysis

In the present case, because Defendant Ned Noretto resides in Oregon, venue would clearly be proper in the District of Oregon under *28 U.S.C. § 1391(a)(1)*. However, just because venue is proper in that district, does not mean that it is not proper in another district; venue can be proper in more than one district. *See, e.g., Overland, Inc. v. Taylor, 79 F. Supp. 2d 809, 811 (E.D. Mich. 2000)* (Gadola, J.) ("Venue may be proper in more than one judicial district under *section 1391*."). Therefore, the Court must determine whether venue is also proper in the Eastern District of Michigan.

For venue to be proper in the Eastern District of Michigan, this district must be shown to satisfy the requirement of *28 U.S.C. § 1391(a)(2)*. That is, this district must be the location of a substantial part of the events or omissions giving rise to the [**20] claim or the location of a substantial part of the property that is the subject of the action.

In the present case, because Defendant bears the burden of establishing that venue is improper, *see*

Moore's Federal Practice P 110.01, Defendant must demonstrate that (1) no substantial part of the events giving rise to this claim occurred in the Eastern District of Michigan and that (2) no substantial part of the property that is the subject of the action is located in the district. *See 28 U.S.C. § 1391(a)(2)*. In articulating the meaning of "substantial part," the United States Court of Appeals for the Sixth Circuit has stated that "this includes any forum with a substantial connection to the plaintiff's claim." As this Court has previously recognized, *§ 1391(a)(2)* "does not require venue in the [*655] district with *the most* substantial contacts to the dispute. Rather, it is sufficient that *a substantial part* of the events occurred in the challenge venue, even if a greater part of the events occurred elsewhere." *Amphion, Inc., 285 F. Supp. 2d at 946* (emphasis added)(quoting *Greenblatt v. Gluck, 265 F. Supp. 2d 346, 352 (S.D.N.Y. 2003)* (citations omitted)). Thus, even if a majority of the events [**21] occurred in the District of Oregon, venue can still be proper in the Eastern District of Michigan if there is a substantial connection or contact between the subject matter of this case and this district.

In this case, for reasons parallel to those discussed in the personal jurisdiction analysis conducted above, the Court finds that there is a substantial connection between the events and property giving rise to this cause of action and the Eastern District of Michigan. In particular, Defendant sought and gained employment with a company headquartered in Michigan. Defendant's employment required that he report directly to supervisors working in this district, and that he attend training in this district. Both actions, Kelly maintains, provided Defendant with the confidential information and trade secrets now at the center of this litigation. Additionally, Defendant acquired information subject to this suit by using Kelly's Michigan based servers. Finally, as part of Defendant's employment, he entered into a non-compete, non-solicit, and non-disclosure agreement with the Michigan company. It is that Agreement that is now central to this dispute.

Although it is clear that there may be [**22] substantial events that occurred in Oregon that are relevant to this dispute, the facts indicate that "a substantial part of the events" and the property at the heart of the dispute are centered in the Eastern District of Michigan. Accordingly, Defendant has not met his burden of demonstrating that venue is improper; venue is proper in this district and the Court will deny Defendant's motion to dismiss or transfer the action.

## V. Preliminary Injunction

### A. Legal Standard

The decision of whether or not to issue a preliminary injunction lies within the sound discretion of the district