UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KELLY SERVICES, INC.,

    Plaintiff,

v.

                                Case No. 2:07-cv-14989

CYNTHIA EIDNES,
                                Hon. John Feikens

    Defendant.

---

| BUTZEL LONG | FRASER TREBILCOCK DAVIS & |
|---|---|
| By: James J. Giszczak (P46917) | DUNLAP, P.C. |
|     Katherine D. Goudie (P62806) | By: Michael P. Donnelly (P45221) |
| 150 West Jefferson, Suite 100 |     Anne B. Widlack (P35763) |
| Detroit, MI 48226 | One Woodward Ave., Suite 1550 |
| (313) 225-7000 | Detroit, MI 48226 |
| Attorneys for Plaintiff | (313) 237-7300 |
| | Attorneys for Defendant |

---

**PLAINTIFF'S REPLY BRIEF IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

Table of Authorities ............................................................................................................. ii

Introduction ......................................................................................................................... 1

Argument ............................................................................................................................. 2

    A.     Kelly Will Succeed on the Merits of Its Claims ............................................... 2

           1.     Customer Relationships and Confidential Information
                  Provide the Necessary Legitimate Business Interests
                  to Support Enforcement of the Non-Compete ..................................... 2

           2.     Kelly Has Taken Reasonable Steps to Protect
                  Its Trade Secrets ................................................................................... 3

           3.     Eidnes Used Kelly's Confidential and Trade
                  Secret Information ............................................................................... 4

           4.     Terry Murphy's Alleged Statement to Eidnes in
                  2005 that the Non-Compete Would Not Be
                  Enforced Is Irrelevant .......................................................................... 7

    B.     The Harm to Kelly If a Preliminary Injunction Is Denied
         Outweighs the Harm to Eidnes If It Is Granted ............................................... 7

Conclusion ........................................................................................................................... 8

# TABLE OF AUTHORITIES

*Kelly Services, Inc. v. Noretto,*
    495 F. Supp. 2d 645 (E.D. Mich. 2007)................................................................ 1, 3, 5, 8

*Lowry Computer Products, Inc. v. Head,*
    984 F. Supp. 1111 (E.D. Mich. 1997)........................................................................ 3

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ran,*
    67 F. Supp. 2d 764 (E.D. Mich. 1999)..................................................................... 3, 6

*Nowogroski Ins. v. Rucker,*
    137 Wn.2d 427; 971 P.2d 936 (Wash. 1999)............................................................ 6

*Park-Ohio Indus., Inc. v. Carter,*
    2007 U.S. Dist. LEXIS 9095 (E.D. Mich. Fed. 8, 2007).......................................... 3, 4

*Rooyakker & Sitz, PLLC v. Plante & Moran, PLLC,*
    276 Mich. App. 146 (2007)........................................................................................ 3

*Stampede Tool Warehouse v. May,*
    272 Ill. App. 3d 580; 651 N.E.2d 209 (1995)............................................................ 6

*Superior Consulting Co. v. Walling,*
    851 F. Supp. 839 (E.D. Mich. 1994).......................................................................... 3

*In re Talmage,*
    758 F.2d 162 (6th Cir. 1985) .................................................................................. 2, 3

# INTRODUCTION

Nowhere in her briefs does Defendant Cynthia Eidnes ("Eidnes") dispute the fact that she was, and plans to continue, competing against Kelly Law Registry ("KLR"), a division of Plaintiff Kelly Services, Inc. ("Kelly"); that she has taken a competitive position, running the Minneapolis office for the legal division of Beacon Hill Staffing, a direct competitor of KLR, in the same market area that she was responsible for on behalf of Kelly; or that she has solicited Kelly's customers. She cannot dispute these facts because they are true. Instead, Eidnes, a Stanford law graduate who worked for law firms for several years as a civil litigator, handled numerous commercial transactions, managed hundreds of lawsuits and outside counsel, and is without question knowledgeable regarding contract interpretation (*see* **Ex. A**, Eidnes' Resume), simply asks this Court to wholly disregard her voluntarily agreed-upon contractual obligations. She specifically requests that this Court throw out her one-year non-compete and non-solicit agreement that she knowingly and voluntarily entered into with Kelly because it is now inconvenient for her to abide by its terms. She of course had no complaints while entering into this agreement or while drawing her six-figure compensation from Kelly.

In support of her arguments, Eidnes makes the outrageous claim that she never once used any of Kelly's confidential information. Her own admissions in her e-mails to the Vice President of KLR demonstrate otherwise. (*See* Ex. B to Response to Motion to Dismiss.) In her position as Senior Sales Director, Eidnes was exposed to, accessed, and used the same types of information such as customer pricing, mark-ups, and strategies, and used the same proprietary databases that Defendant Noretto accessed and used in *Kelly Services, Inc. v. Noretto*, 495 F. Supp. 2d 645 (E.D. Mich. 2007). Judge Gadola held that the information accessed by Noretto constituted trade secrets and that Kelly had a legitimate business interest in protecting this information to support enforcement of its non-compete.

Eidnes also makes the outrageous statement that she could not find any other job in the Country if this Agreement were enforced so that the irreparable harm to her outweighs the harm to Kelly. To begin with, the Kelly agreement Eidnes signed is one-year in duration. This Agreement replaced her prior non-compete agreement with Kelly's predecessor, Wallace Law Registry ("Wallace"), which contained a two-year non-compete and non-solicit. As for employment, there are numerous opportunities for Eidnes in the legal market alone. She, however, simply does not want to be inconvenienced. She can practice law for a law firm or on her own, she can take an in-house position with one of the numerous companies with which she has developed relationships at Kelly's expense, or she can continue her work with Beacon Hill Staffing just outside of the restricted nine-county market area. Indeed, Eidnes argues that she built this practice in Minneapolis on her own. If in fact she is half as good as she claims, she should have no problem using those same skills to build a practice outside of the restricted market area. Therefore, for these reasons, which are discussed more fully below, this Court should grant Kelly's Motion for Preliminary Injunction.

## ARGUMENT

**A.** **Kelly Will Succeed on the Merits of Its Claims.**

**1. Customer Relationships and Confidential Information Provide the Necessary Legitimate Business Interests to Support Enforcement of the Non-Compete.**

Numerous courts have long held that protecting customer relationships and confidential information provide the necessary legitimate business interest that is required to enforce non-compete agreements. *See, e.g., In re: Talmage,* 758 F.2d 162, 166 (6th Cir. 1985) ("We perceive no serious injury to the public in respect to the terms of a one year covenant not to compete, although it is not limited in geographic scope, that is designed to protect the legitimate business interests of CAC, whether deemed confidential information, good will, trade secrets or

established clientele lists."); *Rooyakker & Sitz, PLLC v. Plante & Moran*, PLLC, 276 Mich. App. 146, 158 (2007) ("[U]nder Michigan law, preventing the anticompetitive use of confidential information is a legitimate business interest.").

In analyzing the same types of confidential information involved in this case, Judge Gadola in *Noretto* held:

> Next, turning to the second factor, whether the non-compete agreement protects the legitimate business interests of the moving party, the case law strongly supports the conclusion that <u>Kelly has a legitimate business interest in restricting its former employees from soliciting its customers and in protecting confidential and proprietary information such as customer lists, profit margins, corporate strategies, and pricing schemes.</u> Accordingly, Plaintiff has presented a strong likelihood of success on the merits its claim under the Agreement.

495 F. Supp. at 657 (emphasis added) (citing *Lowry Computer Products, Inc. v. Head*, 984 F. Supp. 1111, 1116 (E.D. Mich. 1997); *Superior Consulting Co. v. Walling*, 851 F. Supp. 839, 847-48 (E.D. Mich. 1994); *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Ran*, 67 F. Supp. 2d 764, 775 (E.D. Mich. 1999)). Therefore, there can be no question that Kelly has the necessary legitimate business interests, making it reasonable to enforce the non-compete agreement against Eidnes.

### 2. Kelly Has Taken Reasonable Steps to Protect Its Trade Secrets.

Kelly has taken more than reasonable steps to protect the confidentiality of its trade secrets. It requires its full-time employees to execute non-compete, non-solicit, and non-disclosure agreements, such as the agreement at issue. Kelly also limits access to confidential information and trade secrets in its databases according to the positions of the employees, provides information on a need-to-know basis, and uses passwords to access information on each database. (**Ex. B**, Tracy Supp. Aff. ¶ 2.) Judge Roberts has held that measures, such as those taken by Kelly, are reasonable and sufficient under the Michigan Uniform Trade Secret Act. *See, e.g., Park-Ohio Indus., Inc. v. Carter*, 2007 U.S. Dist. LEXIS 9095, *39 (E.D. Mich. Feb. 8,

2007) (finding limited distribution of information and password security measures reasonable). Furthermore, Kelly's confidential information, such as pricing, mark-ups, customer leads, strategies, and customer business volume, is not publicly available or generally known. (**Ex. B**, Tracy Supp. Aff. ¶ 3.)

Moreover, in a competitive industry that is driven by relationships and pricing, the fact that competitors keep their information confidential is further demonstrated by Eidnes' own e-mail in which she guesses as to the competitor's ability to lower a mark-up. (**Ex. C**, Eidnes 8/16/06 E-mail to Murphy.[1])

### 3. Eidnes Used Kelly's Confidential and Trade Secret Information.

As demonstrated by Eidnes' own e-mails, the call log listing Eidnes' questions about her use of Kelly's database, and Eidnes' training log, Eidnes accessed Kelly's confidential information on its databases, which provided her with staffing information, assignment and pricing details, customer contract information, and customer business volume; she negotiated pricing terms and mark-ups on behalf of Kelly; she assisted in setting contract terms for some of KLR's largest clients; and she had access to pricing information, strategies, and contract terms that were set by individuals at Kelly's headquarters. (*See* Ex. B, C, & pp. 10-11 to Kelly's Response to Motion to Dismiss; *see also* **Ex. D**, Kerska Aff.). She specifically admitted in her own e-mails that pricing for KLR ran through Kelly's headquarters and that she accessed Kelly's proprietary databases and trade secrets all of the time:

- Eidnes wrote to her Vice President, Terry Murphy, "[A]lthough I am participating in the various calls, anything being contemplated about pricing that affects KLR needs to be run by you early on in the process." (**Ex. C**, Eidnes' 11/05/04 E-mail to Murphy.)

---

[1] All exhibits that have been attached to this Reply and that are redacted to protect Kelly's confidential information and trade secrets will be made available for the Court to inspect *in camera* upon request.

- Eidnes admitted, "I can't believe I had not even thought to consult the ESPM for [redacted] payment terms and guarantee language. <u>I always go there for temp stuff</u> for [redacted], but didn't even think of it in this direct hire context." (*Id.*, 10/9/06 Eidnes' E-mail to Murphy (emphasis added).) **Ex. E** contains a redacted sample of the information on Kelly's ESPM database to which Eidnes is referring.

This information constituted a trade secret, *see Noretto,* 495 F. Supp. 2d at 658-59, and there was no possible way that Eidnes could perform her job without using this information. (Ex. A to Response to Motion to Dismiss, Tracy Aff. ¶ 10.)

Eidnes argues that customers come and go and that no information remains the same, yet this argument flies in the face of her statement that she has built the Minneapolis market. If there was no repeat business from customers, there would be nothing to build. The truth is that Kelly has long-term relationships with its customers through contracts and repeat business as projects and assignments arise. (**Ex. B**, Tracy Supp. Aff. ¶ 4.) With respect to repeat business from customers without long-term contracts, the pricing and project terms may be negotiated, yet these terms are based off of Kelly's confidential information and trade secrets such as its pricing scheme, strategies, and other factors such as its prior business with that customer. (**Ex. B** at ¶ 5.)

Furthermore, Eidnes acts as if she has ownership rights over Kelly's confidential information and trade secrets. Her negotiation of contracts, direct hire placement, and temporary assignment terms and her work with customers, however, involved <u>Kelly's</u> confidential information, trade secrets, and customers; and prior to Kelly's purchase of Wallace Law Registry, it involved <u>Wallace's</u> property and customers, which Kelly purchased. Indeed, in her agreements with Kelly and Wallace, Eidnes expressly acknowledged that she would be using confidential information and trade secrets of these companies and that this information constituted the property of the companies, over which she had no ownership rights. (Ex. A to Preliminary Injunction Motion, Kelly Agreement ¶ 4; **Ex. F**, Wallace Agreement, ¶¶ 7-8.)

5

Judge Steeh rejected a similar argument in *Merrill Lynch, Pierce, Pierce, Fenner & Smith Inc. v. Ran*, 67 F. Supp. 2d 764 (E.D. Mich. 1999), when the defendants attempted to argue that they had ownership rights over the clients that they brought with them to Merrill Lynch. This Court held that those relationships were the property, and a legitimate business interest, of Merrill Lynch, and in fact, those relationships were the very reason why the defendants were recruited by the company in the first place. *Id.* at 775-76. The Court further stated that if the defendants wanted to retain control over those relationships, they should have negotiated that into their contracts with Merrill Lynch. *Id.* 776.

Lastly, Eidnes states that she has not taken any information or memorized anything, yet her solicitation of Kelly's top clients again demonstrates otherwise. Even if this Court accepts her statement that she did not take any documents as true for purposes of this Motion only, her ability to remember and use the pricing, mark-ups, business volume of customers, and Kelly's strengths and weaknesses constitutes the misappropriation of Kelly's trade secrets. Whether data is memorized is of no consequence under the Uniform Trade Secret Act. *Stampede Tool Warehouse v. May*, 272 Ill. App. 3d 580, 590; 651 N.E.2d 209 (1995) ("Using memorization to rebuild a trade secret does not transform that trade secret from confidential information to non-confidential information. The memorization is one form of misappropriation."); *Nowogroski Ins. v. Rucker*, 137 Wn.2d 427, 450; 971 P.2d 936 (Wash. 1999) ("The weight of modern authority is that the manner of taking a trade secret is irrelevant."). At the very least, Eidnes is using her memory of Kelly's pricing, business volume, contact information, and margins to solicit Kelly's customers. Indeed, approximately 20 days after Eidnes resigned from Kelly, Kelly received a call from a customer who was trying to locate Eidnes about their lunch date. (**Ex. G**, 11/20/07 Phone Message for Eidnes.) Therefore, Kelly will succeed on the merits of its misappropriation of trade secrets claim.

### 4. Terry Murphy's Alleged Statement to Eidnes in 2005 that the Non-Compete Would Not Be Enforced Is Irrelevant.

It is ironic that Eidnes claims that she cannot remember any of Kelly's information, yet she can remember the exact date of an alleged oral statement that was made by Terry Murphy over two years ago. Nonetheless, Terry Murhpy's alleged statement to Eidnes that the non-compete would not be enforced, even if accepted as true for purposes of this Motion only, is irrelevant. Eidnes signed the non-compete agreement with Kelly in 2000 – 5 years before Murphy allegedly made this statement; and she left Kelly in 2007 – 2 years after this alleged statement. She cannot claim that she ever relied on this statement during the negotiation of her Kelly agreement. Furthermore, the plain language of the agreement prohibits any modifications of its terms without it being "in writing, and must be signed by [Eidnes] and two senior corporate officers of Kelly. (Ex. A to Preliminary Injunction Motion, Agreement, ¶ 9.) Therefore, Eidnes' statement has no bearing on the outcome of this case.

### B. The Harm to Kelly If a Preliminary Injunction Is Denied Outweighs the Harm to Eidnes If It Is Granted.

If Eidnes is allowed to compete and continue to solicit Kelly's customers, Kelly will suffer irreparable harm to its customer goodwill, competitive edge, and customer relationships, especially when Eidnes was responsible for bringing in 80% of the business for the Minneapolis office. (Ex. A to Response to Motion to Dismiss, Tracy Aff. ¶ 14.)

On the other hand, if the non-compete is enforced, Eidnes merely cannot compete in the nine-county market area and cannot solicit Kelly's customers for a period of one year.[2] During this agreed-upon one year duration, Eidnes can work in many other jobs. For instance, she can work in-house for companies or law firms either as an attorney or as a recruiter, she can practice

---

[2] As noted above, when Eidnes began working for Kelly's predecessor, Wallace Law Registry, Eidnes voluntarily agreed to a non-compete and non-solicit agreement with a duration of two years. (**Ex. F**, Wallace Agreement, ¶¶ 9-10.)

7

law, and she can work as a recruiter in another temporary staffing industry. Eidnes even has the ability to remain in Minnesota, remain working for Beacon Hill Staffing, and compete with Kelly outside the restricted market area. (**Ex. B**, Tracy Supp. Aff. ¶ 6.)

In the *Noretto* case, Noretto, the sole provider for his family, had to move to locate another job in the temporary staffing industry outside of his restricted market area, and despite this, the Court held: "[A]lthough Defendant may not be able to pursue his first choice with respect to an employment or location, Defendant can readily comply with the terms of the Agreement and find a suitable employment position." *Noretto*, 495 F. Supp. 2d at 660. There is no difference here. Eidnes has many more opportunities than Noretto to make a living because of her credentials, experience, and ability to work as an attorney or a recruiter. This Court should therefore reject Eidnes' request to be allowed to violate her Agreement, compete with Kelly, and take Kelly's business and customers.

## CONCLUSION

For the foregoing reasons, and those set forth in its Motion for Preliminary Injunction and Brief in Support and its Response in Opposition to Eidnes' Motion to Dismiss, Kelly requests that this Court enter the proposed preliminary injunction order against Eidnes.

Respectfully submitted,

s/James J. Giszczak (P46917)
s/Katherine D. Goudie (P62806)
Butzel Long
150 West Jefferson, Suite 100
Detroit, MI 48226
313/983-7475
giszczak@butzel.com
goudie@butzel.com

Dated: December 21, 2007              Attorneys for Plaintiff

8

**CERTIFICATE OF SERVICE**

      I hereby certify that on December 21, 2007, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following: Michael P. Donnelly, Esq. and Anne B. Widlack, Esq., Fraser Trebilcock Davis & Dunlap, One Woodward Ave., Ste. 1550, Detroit, MI 48226.

                                          s/James J. Giszczak (P46917)
                                          s/Katherine D. Goudie (P62806)
                                          Butzel Long
                                          150 West Jefferson, Suite 100
                                          Detroit, MI 48226
                                          313/983-7475
                                          giszczak@butzel.com
                                          goudie@butzel.com

Dated: December 21, 2007               Attorneys for Plaintiff
974482.1